916 F.2d 1140
 54 Fair Empl.Prac.Cas. 109,
54 Empl. Prac. Dec. P 40,316, 63 Ed. Law Rep. 477
 Patsy L. TRAUTVETTER, Plaintiff-Appellant,
v.
John B. QUICK, Individually and as Principal of Hymera
Elementary School; Northeast School Corporation; Richard
D. Walters, Individually and as Superintendent of the
Northeast School Corporation; Donald R. Tinchner,
Individually and as Assistant Superintendent of the
Northeast School Corporation; Board of Trustees of
Northeast Corporation; and Howard Turner, James Case,
Ronald Hughes, Ronald Frye, and Larry Reynolds, All
Individually and in their capacities as Members of the Board
of Trustees of the Northeast School District, Defendants-Appellees.
 No. 88-3232.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 6, 1989.
Decided Oct. 12, 1990.
As Amended Nov. 1, 1990.
 
 Robert F. Hunt, Frey, Hunt, Hassler & Lorenz, Terre Haute, Ind., for plaintiff-appellant.
 Peter G. Tamulonis, Donald L. Dawson, Robert M. Kelso, John B. Drummy, Kightlinger & Gray, Indianapolis, Ind., for defendants-appellees.
 Before CUDAHY, MANION, and KANNE, Circuit Judges.
 KANNE, Circuit Judge.
 
 
 1
 Plaintiff-appellant, Patsy L. Trautvetter, brought an action in the district court in which she alleged that the defendants had engaged in sexual discrimination in violation of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended 42 U.S.C. Secs. 2000e et seq., and 42 U.S.C. Secs. 1983 and 1985(3).[1] Count I of her amended complaint alleged that the defendants had engaged in and/or condoned acts of sexual harassment which deprived her of her constitutional rights under Sec. 1983. In addition, Count I alleged that the defendants had conspired to achieve this result, thus depriving her of those same rights under Sec. 1985(3). Count II of the amended complaint alleged that the defendants' sexual harassment had resulted in a violation of Title VII. After discovery, the defendants moved for summary judgment on both counts. Concluding that there were no genuine issues of material fact regarding Trautvetter's allegations of sexual discrimination, the district court granted that motion. Finding no error in that disposition of this case, we affirm.
 
 I.
 
 2
 The following factual account is drawn from the uncontroverted deposition testimony and affidavits of the various parties and their proposed witnesses. In light of the standard under which we review this case, the specific factual allegations which are disputed in the affidavits have been resolved in favor of the plaintiff. See Puckett v. Soo Line R.R. Co., 897 F.2d 1423 (7th Cir.1990).
 
 
 3
 In the fall of 1975, Patsy Trautvetter began her first year of teaching in the Northeast School Corporation in Sullivan County, Indiana. In 1982, after six years of full-time teaching and one year of maternity leave, she was assigned to teach first grade at Hymera Elementary School. Beginning in the fall of 1985, Ms. Trautvetter returned to Hymera Elementary after a second maternity leave to teach second grade. She has since been teaching at Hymera Elementary continuously. Defendant, John Quick, began his term as the principal of Hymera Elementary in 1981 and, as such, was at all times relevant to these proceedings Trautvetter's immediate supervisor.[2]
 
 
 4
 Beginning late in the 1985-86 school year and continuing into the 1986-87 school year, Quick made a number of romantic overtures towards Ms. Trautvetter. Initially, she put off these advances by either politely saying "no" or simply "laughing them off." Eventually, however, she began to respond to Quick's romantic suggestions. Indeed, the record reveals that Trautvetter became involved in a sexual relationship with Quick in which both parties participated actively. The "courtship" proceeded as follows.
 
 
 5
 Quick's first romantic overture towards Ms. Trautvetter occurred on the final day of the 1985-86 school year. A group of teachers, including Ms. Trautvetter and Mr. Quick, had gone out for the evening and eventually ended up at a local bar. Trautvetter left the bar early. After she had arrived home, however, she called the bar and asked that Quick be paged so she could explain to him, for the benefit of another teacher, a joke which had been played on the latter. During the course of that conversation, Quick asked Trautvetter whether her family was home. She responded that they were not. Quick thereafter asked her if she would like to "play house." She replied "no."
 
 
 6
 Later that fall, during a school dance which both Quick and Ms. Trautvetter were chaperoning, Quick came up beside Trautvetter and placed one of his hands next to one of hers such that the two were touching. Ms. Trautvetter testified that she moved her hand away without saying anything. At a second school dance that fall, Quick asked Ms. Trautvetter where her family was that evening. She replied that her children were at her grandparents and that her husband was at work. Quick asked if she would like to go out and "share a bottle of wine." Trautvetter simply ignored Quick's invitation. In like manner, Trautvetter ignored or laughed off other invitations which she received from Quick that fall to go out for drinks. At no point, however, did she indicate to Mr. Quick that she thought his conduct was inappropriate.
 
 
 7
 In November Mr. Quick was hospitalized for a brief period. On one occasion, Ms. Trautvetter and her sister stopped in to see him. She also testified that she took a milkshake to him at another time. On a third occasion, she had gone to the hospital apparently for the purpose of taking Mr. Quick school papers which needed to be signed. Mr. Quick was not in his room at this time. In addition, Ms. Trautvetter made a number of phone calls to Mr. Quick while he was in the hospital. With regard to these calls, she testified that it was easier for her to call than other teachers in the school because her calls, unlike those of the other teachers, would not be long distance.
 
 
 8
 Early in 1987, Ms. Trautvetter stayed home from school with her sick daughter. Mr. Quick telephoned her that evening to ask whether she would be at school the following day. During the course of that phone conversation, Quick stated that he liked to "keep check on [his] teachers." On a separate occasion early that spring, Trautvetter testified that Quick sent her a note after she had interrupted a meeting which Quick was having with a student's parent. In that note, Quick apologized for being "short" with her during that encounter. He also stated, "you mean too much to me to hurt." In a separate note to Trautvetter, Quick wrote, "hot pink is unfair." On one other occasion during this same period, Quick approached Ms. Trautvetter during an organized volleyball game among the teachers and parents and told her that she should play on the other team so he could see her "bounce." Ms. Trautvetter, rather than objecting, said nothing and walked across the court to play on the other team.
 
 
 9
 Ms. Trautvetter recalled one instance in which Mr. Quick had called her that spring. His first words (beyond "hello") were "Who do you love? Who do you love?" Trautvetter responded, "Yes, I love you." She testified that she felt she had to say it.[3] The record reveals, however, that this was not the only time that Trautvetter told Quick that she loved him. She testified that Quick, on numerous other occasions, would state, "I love you. Do you love me?" Her response on these occasions was, "Yes, I love you."
 
 
 10
 On March 13, 1987, Ms. Trautvetter telephoned Mr. Quick and asked him "what was going on." Quick responded that he had feelings for her and suggested that they get together and talk about it. She agreed to join him and the two subsequently arranged to meet in the parking lot of a local business establishment during spring break. Although the meeting lasted about an hour, Trautvetter testified that no physical contact occurred. Mr. Quick did, however, tell Trautvetter that since they were in a motel parking lot he could get a room and they could "settle this now." Trautvetter simply responded "no." Again, however, she did not tell Quick that she thought his conduct was inappropriate.
 
 
 11
 Between March and April of 1987, Quick and Trautvetter engaged in numerous conversations, both over the phone and at school. Some of these conversations were business related, some were personal in nature. Those conversations which were personal in nature consisted of Quick asking Trautvetter how she felt, what she was doing, and "what [she] thought about meeting with him again." Trautvetter testified that she told Quick on those occasions that it was "hard for [her] to get out, that type thing."
 
 
 12
 In April of 1987, the two agreed to meet on at least two occasions at an abandoned school building in Colemont, Indiana; an out-of-the-way place about which Quick had told her. According to Trautvetter, she and Quick would drive around the surrounding countryside, kissing and petting along the way. On one of these occasions, Quick asked Trautvetter if he could fondle her breasts. She let him do so. Again, at no time either prior to or during this encounter did Ms. Trautvetter tell Quick that she thought his conduct was inappropriate.
 
 
 13
 At some point in April, Ms. Trautvetter gave Quick a tape of a love song. She testified that she did so because Quick had earlier given a tape of a song to her. The record reveals, however, that Ms. Trautvetter also called a radio station and requested that "their song" be played over the air. She called Mr. Quick and told him to listen for it.
 
 
 14
 Later that spring, Mr. Quick went to Ms. Trautvetter's house after a "confrontation" he had had with Mr. Walters, the school superintendent. Mr. Quick was concerned that he had overstepped his bounds with Mr. Walters in an earlier meeting. Trautvetter testified that Mr. Quick told her on this occasion that Mr. Turner, a board member with the school corporation, did not like her. She further testified that Mr. Quick told her that he (Quick) was protecting her position.
 
 
 15
 On May 8, 1987, Ms. Trautvetter and Mr. Quick drove in Ms. Trautvetter's car to a Regal 8 Motel where they had sexual intercourse. This rendezvous had been planned for a week. Trautvetter testified that she was nervous on this occasion. Trautvetter also testified that she felt no affection for Quick on this occasion, but engaged in intercourse with him only because she "felt she had to be there." The record reveals, however, that Trautvetter was not physically forced to show up at the motel, nor was she forced to engage in the sexual act. Moreover, the record reveals that shortly after that date, Trautvetter sent Quick a note which read, "I'll remember that night [May 8th] and hope we will be friends forever."
 
 
 16
 Ms. Trautvetter testified that she became emotional at work during the week following May 8, 1987. She testified that Quick had come to visit her in her classroom numerous times during that week and that she finally told him to leave her alone. Although Quick stayed away from her classroom after that encounter, he did call her to see how she was doing.
 
 
 17
 Towards the end of the 1986-87 school year, both Ms. Trautvetter and Mr. Quick attended an end-of-the-year party at a local bar. During the course of the dinner that evening, Quick was seated across the table from Trautvetter and tried to put his foot on her lap. She pushed it off in silence. Later that evening Trautvetter and Quick held hands under the table while they talked to others at the party. Trautvetter testified that Quick initiated the contact and she simply "let" him continue. A few days later, Quick telephoned Trautvetter and told her that his wife was out of town and asked if she could get a babysitter and come over to his house. She told him she could not do that. The following evening, Trautvetter told her husband what had been going on between herself and Quick.
 
 
 18
 During the entire period at issue, Carolyn Setty was a teacher at Hymera Elementary School. She and Trautvetter had known each other since 1973; Trautvetter considered her to be a "work friend." As a teacher at Hymera Elementary, Ms. Setty was in a position to observe the relationship which developed between Trautvetter and Quick. She testified that Trautvetter "was very anxious to do anything she could to be around Quick. She was in the lounge and office area very, very frequently." Ms. Setty continued:
 
 
 19
 There was one particular time ... that the library board which is not associated with the school was having a school carnival which I was chairman. Patsy [Trautvetter] did not attend the car--[sic] when she came to the carnival very late, almost at closing and insisted on staying and cleaning up which she was not even a member of the library association, and after everything was cleaned up--I had stayed around as long as I could. There was no more excuses for me to stay there, and Patsy still insisted on staying and was there when I left, she and Mr. Quick.
 
 
 20
 Asked whether she had observed any indication during this period that Ms. Trautvetter was trying to avoid Mr. Quick or to limit the scope of her contact with him, Ms. Setty responded, "No. It would be just the opposite." Asked whether she thought Trautvetter liked Mr. Quick based on what she had observed that school year, Ms. Setty responded, "Yes. She was very anxious to do anything that he wanted done. She was very anxious to please him." In this regard, the testimony of Ms. Jetta Slack, the school secretary and treasurer, is in accord with that of Ms. Setty. When asked whether she thought any of the attention which Ms. Trautvetter had received from Mr. Quick that year was "not welcome," Ms. Slack responded, "No, I think probably--I won't say probably--I think Patsy [Trautvetter] initiated the whole thing. I think she kept the whole thing going. I think she welcomed whatever attention she got. I don't think she ever let it drop until she finally got what she was after." Finally, Ms. Setty testified that at no point during this entire period did Trautvetter confide in her that Quick was harassing her or otherwise pressuring her to engage in sexual activity.
 
 
 21
 On June 4, 1987, Ms. Trautvetter and her husband (Calvin Trautvetter) went to visit Mr. Quick to discuss the problem. According to Ms. Trautvetter, Mr. Trautvetter informed Mr. Quick that he should stay away from his wife. He also advised Mr. Quick that he should inform his own wife of the situation.
 
 
 22
 On June 7, 1987, Ms. Trautvetter and her husband went to the home of Ms. Slack. Trautvetter informed Ms. Slack of her relationship with Mr. Quick. According to Ms. Slack, Trautvetter said "that she [Trautvetter] was the one that should have stopped it because she was older, she shouldn't have let it go on ... that she had no reason to hurt Calvin, to do this ... that she had lost everything, her home, her children and her husband. She was just as much as fault as John [Quick] was. She was the older, she should have been the one that stopped it...." Ms. Slack further testified that she heard Calvin Trautvetter tell her husband that "Patsy told him that she no longer loved him, that she loved John [Quick] and wanted to be with him...."
 
 
 23
 On June 9, 1987, the Trautvetters met with Richard Walters, the superintendent of the Northeast School Corporation. According to Ms. Trautvetter, Mr. Walters informed them that Quick had contacted him the previous day and informed him of their relationship. Trautvetter further testified that Mr. Walters informed her and her husband that Mr. Quick had accepted full responsibility for the relationship. Mr. Walters asked them to "keep it quiet." At this point, however, it is undisputed that Mr. Walters was not aware of Ms. Trautvetter's allegations of sexual harassment; she had not told him. Indeed, Ms. Trautvetter testified that she had not even told her husband of her allegations of sexual harassment at this juncture.
 
 
 24
 Early in the morning of June 8, 1987, Mr. Walters met with John Quick and his wife. At this meeting, Quick told Mr. Walters of his relationship with Ms. Trautvetter. Later that day, Mr. Walters met with James Case, a member of the board of the Northeast School Corporation, who had earlier been informed by Quick of Quick's relationship with Trautvetter. That evening, the Northeast School Corporation had a board meeting. Prior to this meeting, Mr. Walters informed Mr. Reynolds, the president of the board, about the situation involving Trautvetter and Quick. Mr. Walters thought it best not to inform the entire school board of the situation at this meeting because it involved the private lives of two of the corporation's employees. Over the course of the following week, however, he did visit various members of the board to inform them of the problem.
 
 
 25
 Mr. Walters testified that he met with Trautvetter and her husband on June 9, 1987, the morning after the school board meeting. According to Mr. Walters, Trautvetter acknowledged that she and Quick had had a sexual relationship and appeared to be remorseful. Mr. Walters further testified that he told the Trautvetters that the incident would be investigated and that, in the meantime, it would be best for all involved if they kept it quiet.
 
 
 26
 On June 23, 1987, Ms. Trautvetter called Mr. Walters to express her concern about her job status for the upcoming school year. She also told Mr. Walters that there was more to her side of the story that she needed to tell him. She did not, however, reveal her side of the story to Mr. Walters on that date.
 
 
 27
 On June 26, 1987, Ms. Trautvetter met with Mr. Walters and George Baker, a representative of the Indiana State Teacher's Association. During this meeting, Mr. Walters was informed for the first time of Trautvetter's allegations that Quick had pressured her into entering into the sexual relationship. Mr. Walters testified that he did not begin a formal investigation at that point, however, because there was a school board meeting coming up on July 1, 1987, and he thought it would be best first to brief the executive committee of the board on the situation as it then existed. At that July 1st meeting, the executive committee, with the advice of legal counsel, decided that the best course would be to try to get the parties to come together to discuss the issue. A subsequent meeting was held between Mr. Walters, Ms. Trautvetter, Mr. Quick and their respective legal counsel to attempt to outline a course of action. This meeting, however, was dismissed when the parties could not agree on a purpose or format; subsequent meetings similarly fell through.
 
 
 28
 On July 14, 1987, Mr. Walters and the school corporation's legal counsel, Mr. Springer, met to begin the investigation into Ms. Trautvetter's allegations. Mr. Walters thereafter contacted most of the teaching staff at Hymera Elementary to find out whether any of them knew of any instances of harassment among the employees at that school. Upon the advice of Mr. Springer, Mr. Walters' questions to these individuals were general in nature--that is, he did not ask specific questions about Ms. Trautvetter and Mr. Quick unless the person being interviewed suggested that he or she had knowledge of the situation. All of the persons interviewed (if they were aware of the relationship which existed between Trautvetter and Quick) indicated to Mr. Walters that they thought that relationship was consensual. Moreover, there was no indication from any of those persons that Quick had harassed Trautvetter sexually or otherwise.
 
 
 29
 Walters again met with Trautvetter and her husband on July 17, 1987. Walters testified:
 
 
 30
 I asked him [Calvin Trautvetter] if they had anything that was [relevant] to this case, would they please present it to me so I could make a very wise decision in this issue. And Calvin made the statement to me that they basically would not, ... that he ... had what I call an ace in the hole which he would try to present at the appropriate time.
 
 
 31
 Mr. Walters subsequently concluded his investigation. He found that the relationship which existed between Ms. Trautvetter and Mr. Quick was consensual in nature and, as such, that it did not result from any sexual harassment on the part of Mr. Quick. A letter was sent to both parties on July 22, 1987, informing them of that decision. That same letter advised both Ms. Trautvetter and Mr. Quick that a transfer would be considered by the board if either of them felt that their past relationship would interfere with their work relationship. Neither party made such a request for transfer. Although this letter did not constitute an official action of the board in that it had not been put to a "formal vote," it is undisputed that the board was presented with the letter and did not present any objections to its being mailed.
 
 II.
 
 32
 This appeal requires us to examine the often-blurred line which exists between human interaction in the workplace which is purely a private matter and human interaction in the workplace which gives rise to sexual harassment claims actionable under either Title VII or the equal protection clause of the fourteenth amendment. Before proceeding to those issues, we note the standard of review under which we analyze this case and the burdens which are imposed on Ms. Trautvetter in sustaining her causes of action.A. Standard of Review
 
 
 33
 Under Federal Rule of Civil Procedure 56(c), a motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Issues concerning the "materiality" of the facts are governed by the substantive law of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues concerning the "genuineness" of any factual dispute which may exist are left to the trial judge. As the Court stated in Anderson:
 
 
 34
 The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
 
 
 35
 Id. at 250, 106 S.Ct. at 2511. Elaborating on the burden imposed on a nonmoving party under this inquiry, the Court stated, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party (citations omitted). If the evidence is merely colorable, ... or is not significantly probative, ... summary judgment may be granted." Id. at 249, 106 S.Ct. at 2511. Our review of a trial court's decision to grant a motion for summary judgment under this standard is de novo. Holland v. Jefferson Nat'l Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir.1989).
 
 B. Title VII: Sexual Discrimination
 
 36
 The district court's dismissal of Ms. Trautvetter's Title VII allegation was premised upon a determination that she had failed to raise a genuine issue of material fact as to whether Mr. Quick's sexual advances were "unwelcome" as they are required to be under the substantive law governing this type of Title VII sexual harassment claim. See Meritor Savings Bank v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). We need not address this sensitive factual issue in that we conclude that Ms. Trautvetter's Title VII allegation has failed to allege any injury which can be redressed under Title VII's equitable remedy provisions.
 
 
 37
 Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. Sec. 2000e-2(a)(1). The enforcement provision of Title VII, 42 U.S.C. Sec. 2000e-5(g), provides in pertinent part:
 
 
 38
 If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate (emphasis added).
 
 
 39
 Trautvetter's amended complaint does not ask for such equitable relief; rather, she prays for "an award of damages, including but not limited to, her attorney's fees incurred in conjunction with the presentation of her claim." Title VII does not contemplate such a damage award.
 
 
 40
 In Bohen v. City of East Chicago, 799 F.2d 1180 (7th Cir.1986), this court held that no damages--only equitable remedies--are available according to the statutory language of Title VII. Recognizing an emerging split in the circuits on precisely this issue, we stated:
 
 
 41
 Several circuits have begun to suggest in dicta that nominal damages could be awarded in situations like these to create a remedy upon which to tack an award of costs and attorneys fees (citations omitted). We believe the better view, in accord with the majority of decisions, is that no damages are available under Title VII. If Congress wishes to amend the provisions of Title VII to provide a remedy of damages, it can do so.
 
 
 42
 Id. at 1184; see also Brooms v. Regal Tube Co., 881 F.2d 412, 423 (7th Cir.1989) ("Title VII only provides for equitable relief; a district court cannot award damages, either punitive or compensatory, to redress a violation of Title VII."); King v. Board of Regents of Univ. of Wis. System, 898 F.2d 533, 537 (7th Cir.1990) ("Compensatory, nominal, and punitive damages are not available under Title VII.")
 
 
 43
 Ms. Trautvetter has not raised any claim for equitable relief. Moreover, we are not sure that she has such a claim for it is undisputed that Ms. Trautvetter was neither affirmatively nor constructively discharged from her position at Hymera Elementary in relation to or as a result of these allegations. Indeed, at the time of oral argument, Ms. Trautvetter was still teaching at Hymera Elementary, having rejected an offer from the Northeast School Corporation to be transferred to a separate school. Ms. Trautvetter has also failed to allege (or demonstrate) that Mr. Quick's sexual advances infringed in some manner upon her ability to obtain a promotion or other job-related benefit. Thus, we are left with no prayer upon which the equitable relief provided for under Title VII may be granted. Accordingly, we affirm the district court's dismissal of Ms. Trautvetter's Title VII claims.
 
 C. Section 1983
 
 44
 In support of her Sec. 1983 claim, Ms. Trautvetter argues that the defendants' actions, in both their individual and official capacities, violated her constitutional rights. Her specific allegations refer to: (1) John Quick's sexual advances; and (2) the remaining defendants' alleged failure to take appropriate action which she argues served to condone and perpetuate Quick's acts of sexual harassment. The district court dismissed this portion of Ms. Trautvetter's complaint without expressly addressing her Sec. 1983 claim. This omission may have been the result of the district court's confusion as to the precise substantive constitutional right upon which Ms. Trautvetter's Sec. 1983 action was premised. We share this confusion. Nevertheless, assuming her Sec. 1983 allegation to be premised upon a violation of the equal protection clause of the fourteenth amendment, we affirm the district court's dismissal in that we conclude that she has failed to raise a genuine issue of material fact which will substantiate such a claim.
 
 
 45
 Ms. Trautvetter's allegations under Sec. 1983 refer generally to a "deprivation, under color of law, and of the customs and usages of the State of Indiana, of rights, privileges and immunities secured to her by the Constitution of the United States." This allegation generally follows the contours of a Sec. 1983 claim in that a party wishing to assert a claim based on Sec. 1983 must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988) (citations omitted); Hughes v. Meyer, 880 F.2d 967, 971 (7th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 2172, 109 L.Ed.2d 501 (1990). The term "generally" in the preceding sentence is operative, however, in that Ms. Trautvetter does not state the specific constitutional right to which she is referring. In this regard, we note that Sec. 1983 provides a remedy for deprivations of specific constitutional rights, not generalized allegations of constitutional deprivations. See Wilson v. Civil Town of Clayton, 839 F.2d 375, 379 (7th Cir.1988) (complaint which fails to mention equal protection, discrimination, differential treatment, preference, prejudice or any other phrases invoking the equal protection clause of the fourteenth amendment fails to properly allege an equal protection claim). Nevertheless, because Ms. Trautvetter does allege "sexual harassment" throughout her complaint and because sexual harassment may, in certain circumstances, constitute gender discrimination in violation of the equal protection clause of the fourteenth amendment, King v. Board of Regents of Univ. of Wis. System, 898 F.2d 533, 537 (7th Cir.1990) (citing Bohen v. City of East Chicago, 799 F.2d 1180, 1185 (7th Cir.1986)), we will assume that Ms. Trautvetter has specifically pleaded such a claim and address the propriety of the district court's dismissal of the same.[4]
 
 
 46
 The parameters of a cause of action alleging sexual harassment as a violation of the equal protection clause have not been precisely defined. We have noted, however, that such a claim generally follows the contours of a Title VII allegation of sexual harassment. King, 898 F.2d at 537. Under either cause of action, there must be a showing of sexual harassment or discrimination. There is, however, an important distinction for purposes of our review which exists between the two; intent to discriminate must be shown under equal protection while Title VII requires no such showing. Id. Thus, a plaintiff wishing to sustain an equal protection claim of sexual harassment must show both "sexual harassment" and an "intent" to harass based upon that plaintiff's membership in a particular class of citizens--i.e., male or female. In light of this burden, our task in reviewing the district court's grant of summary judgment necessarily becomes one of determining whether Ms. Trautvetter's allegations have raised a genuine question of material fact as to either of these two requirements.
 
 
 47
 The "harassment" prong of this type of equal protection claim was discussed by this court in Bohen v. City of East Chicago, 799 F.2d 1180 (7th Cir.1986). Our analysis focused on the analogous burden which a plaintiff bears in showing actionable "sexual harassment" under Title VII. Citing Meritor Savings Bank v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986), we stated, "the harassment 'must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment." ' " 799 F.2d at 1186 (other citations omitted). In determining whether the alleged harassment rises to this level we must examine whether the alleged sexual advances were "unwelcome." See Meritor, 477 U.S. at 68, 106 S.Ct. at 2406 ("The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.' ")
 
 
 48
 Although this determination is one that is traditionally left to the trier of fact, see id., the district court concluded for Title VII purposes, based on an examination of the entire record, that Ms. Trautvetter had not raised any genuine issues of material fact as to whether Mr. Quick's sexual advances were "unwelcome." The district court stated, "[t]he fact that she [Ms. Trautvetter] sometimes said no to his [Mr. Quick's] suggestions or made excuses not to meet him does not imply that she did not welcome his advances, especially when she often did agree to meet him and participated actively in the relationship." Indeed, if the test focuses on the extent to which Ms. Trautvetter made it known that the sexual advances were "unwelcome," it might be difficult to disagree with the district court's conclusion that there was no genuine issue of material fact on this question. Beyond the fact that Ms. Trautvetter initially declined Mr. Quick's offers for drinks, etc., the record is void of any evidence showing that she declared those advances to be unwelcome. Much to the contrary, the course of conduct when reviewed in its entirety, appears to substantiate the district court's findings that Ms. Trautvetter grew to "welcome" Mr. Quick's advances and even participated in an active way so as to encourage them. The district court need not have addressed this issue of fact, however, and we will not address it further, in light of our conclusion that Ms. Trautvetter has failed to demonstrate that Mr. Quick's advances constitute the type of intentional discrimination based upon an individual's membership in a particular class which has traditionally been viewed as actionable under the equal protection clause of the fourteenth amendment.
 
 
 49
 Like any other equal protection claim, a claim of sexual harassment under the fourteenth amendment must show that the discrimination was intentional. As we previously noted in this precise context in Huebschen v. Dep't of Health and Social Serv., 716 F.2d 1167 (7th Cir.1983):
 
 
 50
 A person bringing an action under the Equal Protection Clause must show intentional discrimination against him because of his membership in a particular class, not merely that he was treated unfairly.... "[T]he decisionmaker [must have] selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."
 
 
 51
 Id. at 1171 (quoting Personnel Administrator v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979)); see also King, 898 F.2d at 537. In light of this "intent" requirement, the issue which we are presented with in this context, like that which was presented to this court in Huebschen, is whether Mr. Quick's sexual advances towards Ms. Trautvetter were "because of" her status as a woman or, in the alternative, whether those advances were inspired by characteristics, albeit some sexual, which were personal to Ms. Trautvetter.
 
 
 52
 A situation almost identical to that which Ms. Trautvetter has alleged was presented to this court in Huebschen. In that case, a male employee and his female supervisor developed a relationship which eventually evolved into one involving romance and sexual activity. After Huebschen, the male employee, called off the relationship and all of the "sexual stuff" which it involved, he was called into his supervisor's office and told by her that there were problems with his job. Shortly thereafter, he was terminated from his position. Huebschen brought a Sec. 1983 action alleging that his supervisor's activity amounted to "sexual harassment" actionable under the equal protection clause. The district eourt denied Huebschen's equal protection claim and this court affirmed. In so doing, we noted that there is a very important distinction for purposes of equal protection analysis between "discrimination" based on factors personal to an individual and "discrimination" based on that individual's membership in a protected class. 716 F.2d at 1172. Because the supervisor's conduct towards Huebschen was based on the former as opposed to the latter--that is, because it was apparent from the record that "Huebschen's gender was merely coincidental to [the supervisor's] action"--we affirmed the district court's judgment that no equal protection violation had occurred.
 
 
 53
 This precise issue was revisited by this court in Bohen v. City of East Chicago, supra, although under a substantially different set of factual circumstances. In Bohen, an Hispanic woman brought a Sec. 1983 action against the City of East Chicago claiming that the sexual harassment and discharge which she had suffered at the hands of her supervisor and fellow employees violated Title VII and the equal protection clause of the fourteenth amendment. The facts upon which she premised her sexual harassment allegations referenced numerous instances of vulgar conduct and lewd sexual suggestions on the part of her supervisor and fellow employees. For example, on her first night of work (she was a dispatcher for the fire department) she awoke from a short nap to find her supervisor's hand pressed against her crotch. This same supervisor constantly spoke to Ms. Bohen of sexual matters and even described his "preferred sexual positions." In addition, he would rub his pelvis against Ms. Bohen's behind when she was standing and spread his legs so that he was always touching her when she was sitting. He even forced Ms. Bohen to leave the restroom door open when she was using the restroom. As for Ms. Bohen's fellow employees, the record indicated that she was the constant target of their obscene comments and gestures and was even forced to listen to descriptions of their sexual fantasies of which she was usually the target. The record also showed that other female employees at the fire department were subjected to similar treatment. Based on all of this evidence, we concluded that the harassment to which Ms. Bohen was subjected was because of her gender and, as such, that she had made out a claim of sexual harassment which was actionable under the equal protection clause of the fourteenth amendment.
 
 
 54
 In so concluding in Bohen, we took the opportunity to note some general observations about the scope of the right to be free from sexual harassment under the equal protection clause. With regard to the "intent" requirement, we stated:
 
 
 55
 [I]t is not necessary to show that all women employees are sexually harassed. Harassment of the plaintiff alone because of her sex is enough. It is a good defense, however, if the employer can show that the harassment suffered by the plaintiff was directed at the plaintiff because of factors personal to her and not because she is a woman.
 
 
 56
 799 F.2d at 1187. Thus, while it is clear that an individual plaintiff may pursue a sexual discrimination claim under the fourteenth amendment based solely upon acts of discrimination directed towards her, it is also clear that such a claim must show an intent to discriminate because of her status as a female and not because of characteristics of her gender which are personal to her. Without question, this line becomes indistinct when those factors which are personal to an individual include attributes of sexual attraction. In such a case, a careful analysis of the conduct which is alleged to be harassment is necessary to determine whether it is indeed "harassment" as that term is understood in the Title VII context--the first prong of our analysis. If this distinction--subtle as it is--is not maintained, any consensual workplace romance involving a state supervisor and employee which soured for one reason or another could give rise to equal protection claims if the employee simply alleges that his or her supervisor's conduct during the term of the romance constituted "sexual harassment." Such a scenario constitutes precisely the type of claim which the equal protection clause's "intent to discriminate" requirement was meant to discourage.
 
 
 57
 Our most recent discussion of this issue came in King v. Board of Regents of Univ. of Wis. System, supra. In King, the plaintiff brought an action against the University of Wisconsin alleging, among other things, that the sexual advances of a supervisor, Mr. Sonstein, during the term of her employment constituted sexual harassment actionable under the equal protection clause. Because of the factual situation which was presented--a situation significantly different from that which we face today--we concluded that Ms. King's allegations did give rise to an equal protection claim. Ms. King alleged that Mr. Sonstein made suggestive innuendoes towards her while leering at her in a sexually suggestive manner. For example, he would touch her, rub up against her, place objects between her legs, and make suggestive remarks commenting on various parts of her body. Apparently, Mr. Sonstein did not confine his behavior solely to Ms. King either, for the record indicated that he directed similar behavior towards other female employees as well. In fact, his behavior was blatant enough for other members of the faculty to notice and comment upon.
 
 
 58
 In concluding that Mr. Sonstein's conduct did amount to sexual harassment, the majority rejected Sonstein's arguments, based on our decision in Huebschen v. Department of Health and Social Services, that his conduct was based on Ms. King's personal characteristics and not on gender. The majority stated, "King was and remains a woman. That is all that is required." 898 F.2d at 538 (citing Volk v. Coler, 845 F.2d 1422, 1433 (7th Cir.1988)). As Judge Manion noted in dissent, however, this is not all that is required. See King, 898 F.2d at 542. The fact of King's status as a woman (or Huebschen's status as a man ) is only the foundation of a "sexual harassment" claim under the equal protection clause; the structure which must necessarily be placed on top of that foundation must show that King was harassed because of her status as a woman. The "intent to discriminate" requirement of equal protection jurisprudence requires no less. Indeed, the majority in King appeared to take cognizance of this fact when it stated, "If, as a purely personal matter, a boss and a particular employee are not compatible, it would not be sexually discriminatory to harass the employee on that basis." Id. at 539. As a corollary to this, we suggest that if, as a purely personal matter, a supervisor and a particular employee do find each other sexually attractive, it would not be sexually discriminatory under the equal protection clause for the two to engage in sexual activity. This premise simply reaffirms the principle of equal protection jurisprudence earlier set forth by the Supreme Court in Personnel Administrator v. Feeney, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), and relied upon by this court in Huebschen.
 
 
 59
 Applying these principles of equal protection jurisprudence, enunciated by the court in Huebschen, to Ms. Trautvetter's equal protection allegations under Sec. 1983, we conclude that she has not raised a genuine issue of material fact as to whether Mr. Quick's sexual advances were because of her status as a woman. Certainly, the underlying fact is that Ms. Trautvetter is a woman. But, as we have noted, her status as a woman does not itself support an allegation of sexual harassment under the equal protection clause; she must demonstrate in a colorable manner that Mr. Quick's advances were because of her status as a woman as opposed to characteristics, albeit some no doubt sexual, which were personal to her. This she has failed to do. Indeed, there is nothing in the record to indicate that Mr. Quick's feelings were based on anything but a personal attraction to Ms. Trautvetter. Ms. Trautvetter's own testimony leads us to this conclusion; in reference to the March 13, 1987 phone call, Ms. Trautvetter testified that Mr. Quick told her that he "had feelings for her" and he thought they should get together and talk about it.
 
 
 60
 Significantly, the same cannot be said for our decisions in which sexual harassment has been remedied under the equal protection clause of the fourteenth amendment. In Bohen, the plaintiff was subjected to demeaning and cruel sexual abuse at the hands of her supervisor and fellow employees; she was subjected to offensive touching; when using the restroom, she was forced to leave the door open; and, she was forced to listen to her fellow employees' verbal recitations about sexual fantasies of which she was a part. Likewise, in King, the plaintiff had objects placed between her legs by Mr. Sonstein and, over her objections, was forcibly kissed and fondled after he had followed her into the women's restroom at a party. Although clearly not dispositive of the intent issue, it is also significant that Mr. Sonstein directed similar conduct towards other women, despite their requests that he stop. In each of these cases, we concluded that the defendant's conduct was not based upon some personal characteristic of the plaintiff; rather, the harassment was because of the plaintiff's status as a woman. See, e.g., Bohen, 799 F.2d at 188 ("had Bohen been male, she would not have suffered as she did") (quoting the district judge's memorandum of decision). Because there is nothing in this record to indicate that Mr. Quick's sexual advances were anything but personal in nature--that is, because there is no showing that Mr. Quick intended to "harass" Ms. Trautvetter simply because she was a woman--we conclude that Ms. Trautvetter has not raised a genuine issue of material fact as to Mr. Quick's intent and, accordingly, affirm the grant of summary judgment on that ground.[5]
 
 D. Section 1985(3)
 
 61
 Under 42 U.S.C. Sec. 1985(3), a plaintiff must allege four elements to make out a valid cause of action:
 
 
 62
 (1) a conspiracy;
 
 
 63
 (2) a purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws;
 
 
 64
 (3) an act in furtherance of the conspiracy, and;
 
 
 65
 (4) an injury to his person or property or a deprivation of any right or privilege of a citizen of the United States.
 
 
 66
 Triad Associates, Inc. v. Chicago Housing Authority, 892 F.2d 583, 591 (7th Cir.1989) (citing United B'hood of Carpenters & Joiners of America v. Scott, 463 U.S. 825, 828-29, 103 S.Ct. 3352, 3355-56, 77 L.Ed.2d 1049 (1983)), petition for cert. filed (June 25, 1990). The district court's dismissal of Ms. Trautvetter's Sec. 1985(3) allegation focused on her failure to allege sufficient facts to support the first and last of these requirements. We agree with the district court that Ms. Trautvetter's allegations do not sufficiently allege the existence of a conspiracy among the defendants to deprive her of the equal protection of the laws and affirm on that basis.
 
 Ms. Trautvetter's complaint alleges:
 
 67
 [T]he defendants were conspirators engaged in a scheme and conspiracy designed and intended to deny and deprive ... her of rights guaranteed to plaintiff under the Constitution and laws of the United States and that Walters and the Board of Trustees aided and abetted Quick in his sexual harassment and discrimination of plaintiff.
 
 
 68
 In support of that allegation, Ms. Trautvetter refers initially to the fact that James Case, a member of the Board of Trustees of the school corporation, had been told by Mr. Quick of the relationship which existed between Ms. Trautvetter and himself. According to Ms. Trautvetter, Mr. Case's failure to take action on this information constituted an act in furtherance of the conspiracy among all of the defendants to deprive her of her constitutional rights. We disagree.
 
 
 69
 If Mr. Case was aware of Ms. Trautvetter's allegations of sexual harassment at the time which Ms. Trautvetter alleges he was, then he arguably had an obligation to present that knowledge to the executive committee of the school board. The flaw in Ms. Trautvetter's allegation in this regard, however, is that there is no factual support for the proposition that Mr. Case was aware of her allegations of sexual harassment prior to the time that Mr. Walters became aware of those allegations.[6] The only indication in the record is that Mr. Case was aware of "a relationship" which existed between Mr. Quick and Ms. Trautvetter. Was Mr. Case supposed to presume that this "relationship" was the result of sexual harassment on the part of Mr. Quick? Without such a presumption, there is no factual support for Ms. Trautvetter's allegations that his "failure to act" amounted to an intentional act in furtherance of a conspiracy to deprive her of constitutional rights. See generally United States v. Savage, 891 F.2d 145, 147 (7th Cir.1989) (allegations of conspiracy must be supported by facts suggesting a meeting of the minds between two or more persons).
 
 
 70
 The second portion of Ms. Trautvetter's Sec. 1985(3) allegation argues that a "conspiracy" among the defendants is shown by their collective failure "to take any action against defendant Quick to alleviate the hostile working environment within which [she] was required to continue her employment." Like her previous claim, this allegation finds no support in the record.
 
 
 71
 Contrary to Ms. Trautvetter's allegations of a "failure to act," the record indicates that Mr. Walters, in consultation with Mr. Springer (the school board's legal counsel) and Mr. Reynolds (the president of the school board), did conduct an investigation into the allegations of sexual harassment. In conducting this investigation, Mr. Walters interviewed a majority of the staff at Hymera Elementary to determine whether any of them had noticed any acts of harassment on the part of Mr. Quick. The general response was that the relationship between Quick and Trautvetter was consensual. Indeed, those persons interviewed who were aware of the relationship indicated that Ms. Trautvetter, rather than shying away from Mr. Quick's advances and expressing displeasure at his attention, actively pursued that relationship. Thus, it is apparent from the record that Mr. Walters did pursue Ms. Trautvetter's allegations of sexual harassment. The fact that she was not pleased with the result of that investigation does not demonstrate that the investigation was somehow deficient. Finally, we note that the both Mr. Quick and Ms. Trautvetter were offered a transfer from Hymera Elementary if either believed that he or she could no longer work in that environment. Neither Mr. Quick nor Ms. Trautvetter accepted that offer. In light of these facts, Ms. Trautvetter's claim that the defendants failed to take any action to alleviate the hostile work environment within which [she] was required to continue her employment rings hollow.
 
 
 72
 Simply put, we do not believe that Ms. Trautvetter has supported her Sec. 1985(3) allegations with any colorable evidence of a "conspiracy" or "meeting of the minds" among the various defendants to deprive her of any constitutional rights. To the contrary, we believe that the investigation conducted by Mr. Walters adequately responded to her complaint and resolved the issue in a manner that was consistent with the information uncovered by that investigation. Accordingly, we affirm the district court's dismissal of this portion of Ms. Trautvetter's complaint.
 
 III.
 
 73
 For all of the foregoing reasons, we AFFIRM the decision of the district court.
 
 
 74
 CUDAHY, Circuit Judge, concurring.
 
 
 75
 I concur in the result and in the opinion except for the parts of Section II. C. which do not purport to rely on the "welcome" nature of the advances.
 
 
 
 [1]
 Trautvetter's first complaint, filed on August 21, 1987, alleged that the defendants had subjected her to sexual harassment in violation of 42 U.S.C. Secs. 1983 and 1985(3). After receiving a right to sue letter issued by the Equal Employment Opportunity Commission, Trautvetter amended her complaint to include a Title VII allegation
 
 
 [2]
 All of the other defendants served in their named capacities at all times relevant to these proceedings
 
 
 [3]
 Ms. Trautvetter testified regarding this incident as follows:
 And I thought here I am, more pressure. I thought I'll just tell him. In that situation I found myself by not saying no and just--I just felt myself getting in deeper and deeper. And when he came across with who do you love, I just told him. I was caught. I had to say it.
 
 
 [4]
 Ms. Trautvetter's Sec. 1983 allegation cannot be referring to her Title VII right to be free from sexual harassment in the workplace. "Section 1983 provides a remedy for deprivation of constitutional rights. It supplies no remedy for violations of rights created by Title VII." Gray v. Lacke, 885 F.2d 399, 414 (7th Cir.1989) (citing Alexander v. Chicago Park Dist., 773 F.2d 850, 855 (7th Cir.1985), cert. denied, 475 U.S. 1095, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986)), cert. denied, --- U.S. ----, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990)
 
 
 [5]
 With regard to the Sec. 1983 action against the remaining defendants, we assume that Ms. Trautvetter's allegation focuses on the alleged failure of Mr. Walters and the members of the school board to adequately investigate her claim of sexual harassment. See Meritor Savings Bank, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); Bohen, 799 F.2d at 1187 ("[A] plaintiff can make an ultimate showing of sex discrimination ... by showing that the conscious failure of the employer to protect the plaintiff from the abusive conditions created by fellow employees amounted to intentional discrimination.") As is illustrated in our discussion of Ms. Trautvetter's Sec. 1985(3) claim, infra, the factual premise of this allegation is not supported by the record. Accordingly, we affirm the dismissal of the Sec. 1983 allegations as to the remaining defendants on this ground
 
 
 [6]
 The record reveals that Mr. Case became aware of "a relationship" which had existed between Trautvetter and Quick sometime around June 6, 1987. This was a day or two prior to the day Trautvetter and her husband initially went to Mr. Walters. There is no indication that Mr. Case knew of her allegations of sexual harassment. When asked what she knew about the conversation between Mr. Quick and Mr. Case during which Mr. Case learned of the relationship, Ms. Trautvetter responded, "I don't--he [Mr. Quick] had just gone to him an evening or two prior to [June 8, 1987] and told him."