**Beth Ann FARAGHER and Nancy Ewanchew, Plaintiffs,**

v.

**CITY OF BOCA RATON, a political subdivision of the State of Florida; Bill Terry, individually, and David Silverman, individually, Defendants.**

No. 92–8010–CIV.

United States District Court, S.D. Florida.

July 22, 1994.

William R. Amlong, Amlong & Amlong P.A., Fort Lauderdale, FL, for plaintiffs.

Peter Hurtgen, Esq., Cathy Stutin, Esq., Morgan, Lewis & Bockius, Miami, FL, for City of Boca Raton.

Michael Burke, Johnson, Anselmo, Murdoch, Burke & George, P.A., Fort Lauderdale, FL, for Bill Terry.

Stuart Goldstein, Miami, FL, for David Silverman.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HIGHSMITH, District Judge.

In 1992, Plaintiffs Beth Ann Faragher & Nancy Ewanchew, former lifeguards for the City of Boca Raton, brought this sexual harassment action against the City and two City employees, Bill Terry and David Silverman. The following claims in the amended complaint came before the Court for non-jury trial on June 21, 1994:

Count I: Faragher's Title VII claim against the City.

Count II: Faragher's § 1983 claims against Terry & Silverman.

Count III: Ewanchew's § 1983 claims against Terry & Silverman.

Count IV: Faragher's battery claim against Terry.

Count V: Ewanchew's battery claim against Terry.

Count VI: Faragher's claim for negligent retention and supervision of Terry against the City.

Count VII: Ewanchew's claim for negligent retention and supervision of Terry against the City.

Having received documentary and testimonial evidence, having heard arguments of counsel, and being otherwise fully advised in the premises, the Court makes its findings of fact and publishes its conclusions of law.

### FINDINGS OF FACT

#### A. The Marine Safety Section

1. Plaintiffs Beth Ann Faragher and Nancy Ewanchew are two females who formerly worked as ocean lifeguards in the Marine Safety Section of the Parks and Recreation Department for Defendant City of Boca Raton ("City").

2. The City employed Faragher on an intermittent basis from September, 1985, through June, 1990, and Ewanchew from April, 1987, through April, 1989.

3. Defendant Bill Terry was the Chief of the Marine Safety Section throughout the plaintiffs' tenure with the City. In December, 1990, however, Terry was transferred to the position of Aquatics Planner, which carries no supervisory authority.

4. Defendant David Silverman was hired by the City as an ocean lifeguard in January, 1980, was promoted to lieutenant in July, 1985, and to Captain in June, 1989.

5. The reporting hierarchy within the Marine Safety Section during plaintiffs' employment was as follows: ocean lifeguards reported to Marine Safety lieutenants, and above them to Marine Safety captains; the captains reported to the Chief of the Marine Safety Section, who was directly supervised by the Recreation Superintendent; the Recreation Superintendent reported to the Director of Parks & Recreation who, in turn, reported to the City Manager.

6. The Court specifically finds that both Marine Safety lieutenants and Marine Safety captains acted in a supervisory capacity vis-a-vis the ocean lifeguards. In particular, the Court finds that Marine Safety Chief Bill Terry, Marine Safety Lieutenant, and later Captain, David Silverman, and Marine Safety Lieutenant, and later Training Captain, Robert Gordon were supervisors of the ocean lifeguards.

7. The Court, however, specifically finds that neither Terry, nor Silverman, nor Gordon had the standing necessary to qualify as higher management for the City.

8. As Chief of Marine Safety, Terry reported to the Recreation Superintendent, which position was held by Lorraine Gardner from 1974 to 1988, by Sandy Dioli–Kumm from 1988 to 1989, and by Buddy Parks thereafter.

9. The City hired its first female lifeguard in 1977. During the time of the plaintiffs' employment, not more than four to six lifeguards, out of a total force of between forty and fifty, were female.

10. The Marine Safety Headquarters is a small, one-story building, which includes a small office, a meeting room, and a locker room. Because of the limited facilities, all of the guards share the same locker room and shower.

11. The confined space at the headquarters building, along with the disproportionate ratio of female to male lifeguards, were in and of themselves conducive to a sort of camaraderie that might, in retrospect, be considered somewhat boisterous. Despite this apparent rambunctiousness, the Court finds credible Ewanchew's statement that the atmosphere in the locker room was respectful among members of a particular shift.

12. In April, 1989, Ewanchew resigned her position with the City. Her stated reason for leaving was that she had found a better job. Thereafter, Ewanchew worked as a lifeguard for Palm Beach County and for the City of Delray Beach. Some time after she had resigned from her position with the City, Ewanchew visited Terry and requested reemployment on a part-time basis. Ewan-chew, however, did not become reemployed by the City.

13. Faragher had worked for the City mostly on a part-time and summer basis while attending college. In June, 1990, Faragher resigned her position to attend law school. Faragher's decision to leave the City was unrelated to the alleged sexual harassment. Moreover, Faragher did not discourage her own sister from applying for a position as a lifeguard with the City.

### B. Bill Terry's conduct

14. It is manifestly clear to the Court that the repute in which Terry was held by his co-workers in the Marine Safety Section was poor. Terry apparently exuded an aura of hostility to most of his subordinates in that section. In short, he was anything but dear to them. Even in the testimony of Captain Richard Morrison, who had worked under Terry for ten years, the Court detected a note of what could at best be characterized as detachment toward his superior. In an apparent effort to mask these feelings, Captain Morrison's responses were somewhat evasive and, when unavoidable, terse.

15. Terry had a propensity to touch female employees on various parts of their anatomies, including the waist, neck, and buttocks. The Court specifically finds that all incidents of touching by Terry, testified to by the witnesses at trial, were uninvited.

16. Further in this regard, the Court has concluded that Terry's testimony denying specific acts testified to by other witnesses is not credible. The Court attempted to reconcile these obvious conflicts in testimony so as not to impute falsehood to some witnesses, particularly Terry, without success. Therefore, the Court finds Terry's testimony in the face of the testimony of other witnesses, substantially less than credible.

17. A particularly egregious incident involving Terry and Ewanchew occurred at the water fountain in the meeting area of the headquarters building. As described by Ewanchew, Terry pressed himself against Ewanchew's buttocks and moved his hips simulating sexual movement.

18. In another incident testified to by Ewanchew, Terry touched Ewanchew on one breast and on the buttocks.

19. The Court finds credible Ewanchew's testimony that Terry would put his arm around Faragher and let his hand rest upon her buttock. Although Faragher's testimony was not as effective as Ewanchew's, the Court also finds quite credible Faragher's testimony regarding Terry's uninvited touching of her buttocks.

20. With regard to Terry's use of language, the Court finds that his remarks in Ewanchew's presence were more directed toward other women. One example is a remark to Ewanchew that Faragher was male-like because she had no breasts.

21. Former lifeguard Beverly Barta both witnessed and experienced offensive conduct on the part of Terry. The Court finds Barta's testimony that she found Terry's touching offensive most credible. According to Barta, Terry touched her on the buttocks without her consent and she avoided him afterwards. The Court finds incredible Terry's specific denial of Barta's assertions, whom the Court found made a highly credible, reliable, and impartial witness.

22. The Court finds credible former lifeguard Jamie Herrington's testimony that Terry placed his hand on her thigh, and that Terry referred to women as "cunts" and "bitches." According to Herrington, however, neither Ewanchew nor Faragher complained to her about Terry.

23. The Court finds credible former lifeguard Victoria Bonner's testimony that Terry, on their first interview, asked her if she was going to "fuck" or "screw" all of the male lifeguards like the rest of the female lifeguards, and that she avoided him thereafter.

24. The Court finds credible former lifeguard Gayle Nye's deposition testimony that she was the subject of several instances of offensive touching by Terry, such as putting his arm around her hip. Nye also observed Terry touching other lifeguards, including Ewanchew and Faragher.

25. The Court finds credible former Marine Safety Section secretary Kathy Buhr's testimony that she did not invite, but was the recipient of, touching by Terry, such as neck rubs. Buhr further testified that she did not object to, nor take offense at such actions.

26. The Court discounts former Marine Safety Section secretary Janice Chisesi's testimony. Although Chisesi admitted to some instances of touching by Terry in the form of neck rubs, she stated that she did not find these offensive. At the same time she portrayed herself as a very proper person, who would be offended by the use of off-color language in her presence. This inconsistency in Chisesi's testimony may be explained by her current position as secretary to the City's Recreation Manager.

*C. David Silverman's conduct*

27. The Court finds that an incident occurred where Silverman tackled Faragher. The Court finds credible Faragher's testimony regarding the following statement by Silverman directed to Faragher: "If you had tits I would do you in a minute." With regard to these incidents, the Court disbelieves Silverman's denial of their occurrence.

28. The Court also finds that Silverman did engage in a pantomime depicting cunnilingus by flicking his tongue, in the presence of both Faragher and Ewanchew, despite Silverman's denial of his having engaged in such conduct.

29. Ewanchew testified that Silverman was her lieutenant and he would make the rounds of the beach in that capacity. While making these rounds, Silverman made the following remark to Ewanchew, "You'll be making the rescues today, because I'm the boss." Silverman also made inappropriate, but not sexually oriented, remarks to Ewanchew, such as, "There are a lot of tits on the beach today."

30. According to Ewanchew's credible testimony, Silverman used the term "helmet" to refer to a man's penis. The Court does not find credible lifeguard Red Rothberger's attempt to impute the use of this term on Ewanchew. In light of other witnesses' corroborating testimony, however, the Court finds truthful Rothberger's attribution of the term "red flag day," referring to her menstr-

uation, to Ewanchew. The term "red flag" among lifeguards means "no swimming."

31. The Court found some of Ewanchew's testimony regarding Silverman exaggerated, such as her dreams about Silverman chasing her and about Terry and Silverman shooting her, her husband, and infant child in the courtroom. Despite these exaggerations, the Court found Ewanchew fairly credible, albeit it was obvious that she had an ax to grind. The problem with Ewanchew's credibility stems in part from the Court's finding credible her allegations of the conduct by both Terry and Silverman but finding not credible her "then" feeling of intolerability. She appears to have tolerated such conduct not because she felt she had to but because it wasn't that important to her. Moreover, Ewanchew stated that she was never propositioned by either Terry or Silverman.

32. Ewanchew's credibility also suffered by her refusal to admit that she had not graduated from Miami Dade Community College. She avoided a direct response on this issue by stating that she had intended to finish. Ewanchew's prevarication about her educational background in her application for employment with the City appears to have made her more sensitive to some of the remarks made by Silverman.

33. Silverman testified to conversations with Ewanchew about his sexual activities with others, as well as discussions about sexual positions. Silverman also stated that Ewanchew confided in him about her sexual activities with other males, such as oral sex with fellow lifeguard Dan McCarthy. Finally, Silverman described how Ewanchew would expose her breasts to him in a playful manner. The Court found none of this testimony to be credible, particularly because of Silverman's unsuccessful attempt to present a relaxed demeanor on the witness stand.

34. The Court finds credible Jamie Herrington's testimony that Silverman referred to her nipples being apparent under the cloth of her bathing suit because it was cold, and Silverman's remark that he would like to "eat between her legs." The latter comment took place only in her presence. Moreover, neither Ewanchew nor Faragher complained to Herrington about Silverman. According to Herrington, Silverman "cleaned-up his act" after he was promoted to Marine Safety captain in June, 1989.

35. The Court finds credible former lifeguard Kelly Evans' deposition testimony that Silverman commented on her breasts, but that his comments did not bother her. Although she was friends with Faragher, the two never discussed sexual harassment. Evans also testified in her deposition that Ewanchew used the term "red flag day."

36. The Court finds credible Gayle Nye's deposition testimony regarding Silverman's use of offensive language when addressing her. On her first day on the job, Silverman said to her, "I want to lick your clit." On another occasion, after she had blown an air horn close to his ear, Silverman said to her, "What the fuck are you doing, you cunt, doing that in my ear!" Although he denied using such language, Silverman admitted to coming down hard on Nye during the air horn incident, which he claims caused him ear discomfort for some time afterwards.

37. As previously mentioned, the Court found Beverly Barta to be a most credible witness. Barta both witnessed and experienced offensive conduct from Silverman, as well as from Terry. Thus, she corroborated the existence of a hostile atmosphere as a result of Terry and Silverman's conduct.

38. Although Silverman was reprimanded for using the words "Huck U" doing a beach workout, the Court was not impressed with the significance of this incident upon the plaintiffs' case.

*D. Color of state law*

39. Based on its previous finding that both Terry and Silverman were supervisors of the ocean lifeguards, the Court finds that Terry and Silverman's sexual harassment conduct toward the lifeguards, specifically toward Faragher and Ewanchew, was under color of state law.

40. This finding is further supported by Beverly Barta's highly credible assertion that she was "blackmailed" into signing an undated resignation letter by Silverman and Terry; and by Bender's testimony that he dis-

covered this recurrent practice on the part of Terry during his investigation of Ewanchew's complaints.

*E.   The City's role*

41.   On April 23, 1990, Ewanchew wrote a letter to Richard Bender, Director of Personnel for the City, complaining that, during the time she was employed by the City, she and other female lifeguards had been sexually harassed by Terry and Silverman.

42.   Based on Bender's investigation of Ewanchew's complaint, the City determined that there had been some inappropriate conduct on the part of Terry and Silverman. The City reprimanded both Terry and Silverman for that conduct on June 26, 1990, imposing a choice of disciplinary action in the form of suspension without pay or forfeiture of annual leave.   Terry and Silverman forfeited 160 and 40 hours of annual leave, respectively.

43.   The Court finds Bender's testimony, in some measure, quite credible.   Upon receiving Ewanchew's complaint, Bender moved quickly to investigate and discover specific acts on the part of Terry and Silverman which, in Bender's view, may have constituted inappropriate behavior.   Bender's testimony regarding what he was told during his investigation was truthful, particularly with regard to Faragher's characterization of Terry's touching her as "fanny pats."   The Court, however, does not quite accept Bender's assessment, based on his interview of Faragher, that Faragher did not indicate apprehension of both Terry and Silverman.

44.   With regard to Bender's conclusions, and the discipline imposed upon Terry and Silverman as a result of Bender's recommendation, the Court does not find nor rule that this action is relevant to the issues presented at trial.   Nevertheless, the Court notes that Bender exhibited a somewhat cavalier attitude toward the severity of Terry and Silverman's conduct, and its potential effect upon the City.   Indeed, the Court expressly finds that Terry's and Silverman's sexual harassment conduct toward females in the Marine Safety Section was both severe and pervasive.   In reaching this conclusion, the Court finds that the witnesses for the defense failed to overcome the weight of the plaintiffs' evidence regarding the degree and prevalence of Terry and Silverman's offensive conduct. Indeed, the Court finds that considerable corroborating evidence was presented at trial regarding the hostile atmosphere created by Terry and Silverman.

45.   Prior to Ewanchew's letter, neither Ewanchew, nor Faragher, nor any other lifeguard had complained to the Parks and Recreation Department management about any alleged sexual harassment by Terry and Silverman.

46.   As part of her duties as Recreation Superintendent, Sandy Dioli–Kumm occasionally counselled some of the lifeguards. Ewanchew came to see Dioli–Kumm to discuss work-related issues on several different occasions.   Ewanchew never mentioned anything about sexual harassment or offensive words or touching by Terry or Silverman. The Court, however, does not lend much credence to the balance of Dioli–Kumm's testimony, particularly her statement that she engaged in "covert" observation of Marine Safety personnel because she found them to be "sophomoric."

47.   The Court finds the testimony of Lorraine Gardner, Dioli–Kumm's predecessor in the position of Recreation Superintendent, not credible and wholly without· weight. Gardner's responses appeared rehearsed and she showed favoritism toward the City.   One such obviously contrived, and less than credible, response on the part of Gardner was that she had "never" had "any" female lifeguards come to her office about "anything."

48.   Although Faragher and Ewanchew did not complain to higher management, they did speak about Terry and Silverman's conduct to former Marine Safety Lieutenant and Training Captain Robert ("Flash") Gordon. Moreover, the majority of the female lifeguards complained to Gordon about Silverman's language and conduct.   The lifeguards talked to Gordon, not on a subordinate to superior basis, but because of the high repute in which he was held by members of the Marine Safety Section.   Gordon did not report these complaints to his. supervisor, Bill Terry, or to any other City official.   He did

not feel that it was his place to pass complaints on to his superiors. According to Ewanchew's testimony, Gordon responded to her complaints by stating that the City just didn't care.

49. With regard to Gordon's testimony, the Court notes that he was obviously uncomfortable on the witness stand. Gordon conceded that he had been unhappy over Silverman's, instead of his, promotion to full-fledged Marine Safety captain. Also, Gordon admitted that he had sued the City and the two individual defendants, but that the suit had terminated. It is obvious from his demeanor on the witness stand that Gordon was hesitant to "take sides" in the present litigation, and that he limited his testimony accordingly.

50. With regard to Ewanchew's waiting a year after leaving the City's employment to write to Bender complaining about Terry and Silverman, the Court finds credible Ewanchew's statement that she was reluctant to complain prior to becoming tenured in her new position. The Court finds, however, that the contemporaneous firing of her then boyfriend Dan McCarthy, a former City lifeguard, contributed to Ewanchew's decision to write to Bender.

51. The City had a written sexual harassment policy, promulgated on February 26, 1986. The policy was contained in a memorandum from the City Manager, addressed to all employees. On May 7, 1990, the City revised and reissued its policy against sexual harassment in the form of a Personnel Policy and Procedure Memorandum.

52. Notwithstanding the existence of a written policy against sexual harassment, the Court finds a complete failure on the part of the City to disseminate said policy among Marine Safety Section employees. Neither Terry nor Silverman were ever told or made aware of the City's sexual harassment policy prior to Bender's investigation of Ewanchew's charges. Ewanchew herself never got a copy of the sexual harassment policy during her tenure with the City. The City, therefore, did not discharge its duty under the EEOC guidelines regarding the maintenance of an effective sexual harassment policy.

53. The same union bargaining unit has represented the lifeguards and lieutenants working for the Marine Safety Division since sometime before 1985. The unit has a collective bargaining agreement with the City, which includes an employee grievance and arbitration procedure. Faragher and Ewanchew did not initiate grievance proceedings. In light of the City's lack of dissemination of its sexual harassment policy, the Court finds that Faragher and Ewanchew's failure to avail themselves of grievance proceedings, in and of itself, does not excuse the City from responsibility for the conduct of Terry and Silverman.

54. The Court *does not* find that the City's management knew of the respective acts complained of by Faragher and Ewanchew prior to Bender's receipt of Ewanchew's letter. Nor does the Court impute to the City Gordon's actual knowledge of the lifeguards' complaints regarding Terry's and Silverman's conduct, despite Gordon's supervisory position. As previously noted, the Court does not find that Marine Safety captains ranked as higher management in the City.

55. According to Beverly Barta's credible testimony, she both experienced and witnessed offensive conduct on the part of Terry and Silverman. However, Barta testified that she did not hear others complain about Terry and Silverman. The Court assigns the highest level of credibility to Barta's testimony due to her candor, responsiveness, and directness. Her lack of awareness of other lifeguards' complaints about Terry and Silverman's conduct casts doubt on the City's ability to be aware of such conduct. In resolving this issue, the Court has taken into consideration the fact that there were only four female lifeguards working at the time Barta worked for the City and that Barta worked part-time. The Court has also considered the uniqueness of the lifeguard unit which, although part of the City, was not as aligned as other departments and was far enough away from City Hall as to constitute a remote location. In light of these factors, the Court concludes that Barta's lack of awareness does not, in and of itself, excuse

the City from responsibility for the conduct of Terry and Silverman.

### F. Plaintiffs' damages

56. The Court finds credible the opinion of defense expert, Dr. I. Bruce Frumkin, that Ewanchew does not suffer from post-traumatic stress syndrome, but that she is extremely depressed. According to Dr. Frumkin, Ewanchew would benefit from one to two years of psychological treatment. Because he only conducted an abbreviated evaluation of Ewanchew, Frumkin expressed no opinion on the effect of sexual harassment upon her.

57. The Court finds the testimony of plaintiffs' expert, Dr. Glenn R. Caddy, highly credible and qualified. According to Dr. Caddy, Ewanchew was extremely upset and depressed when he first saw her, due to the present litigation. He found that she had suffered sexually oriented mistreatment by some of the people with whom she had dealt in the past. Although he has no present diagnosis for Ewanchew, he noted that her current state relates back to childhood problems, which make her more vulnerable to sexual trauma than someone without her prior experiences.

58. Although Faragher visited Dr. Caddy once, she did not follow through with psychological treatment. Moreover, Faragher did not seek psychiatric care from any other professional.

55. Ewanchew is entitled to compensatory damages in the amount of $35,000.00.

59. Faragher is entitled to compensatory damages in the amount of $10,000.00.

60. Silverman is not liable for punitive damages.

61. Terry is liable for $2,500 in punitive damages.

### CONCLUSIONS OF LAW

In its conclusions of law, the Court addresses in turn each of the claims considered at the trial of this action.

### 1. Faragher's Title VII claim against the City (Count I)

Courts recognize two theories under which plaintiffs may pursue Title VII claims for sexual harassment: (1) quid pro quo; and (2) hostile environment. *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1315 (11th Cir.1989). Faragher presents a hostile environment claim. Hostile environment sexual harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986).

The elements of a prima facie case for hostile environment sexual harassment are:

(1) the employee belongs to a protected group;

(2) the employee was subject to unwelcome sexual harassment;

(3) the harassment complained of was based upon sex;

(4) the harassment complained of affected a "term, condition, or privilege" of employment; and

(5) respondeat superior.

*Henson v. City of Dundee*, 682 F.2d 897, 903–05 (11th Cir.1982).

The first three elements of the prima facie case do not require much analysis. As a female, Faragher belongs to a protected group. Faragher was subject to unwelcome sexual harassment in the form of uninvited touching by Terry on the buttocks, in the form of offensive comments by Silverman such as, "If you had tits I would do you in a minute," and in the form of an offensive pantomime by Silverman mimicking cunnilingus. In this regard, the Court finds that Faragher made out a prima facie case as to Terry's touching and as to offensive language and gestures on the part of Silverman. Terry and Silverman directed their conduct toward the female lifeguards and secretaries in the Marine Safety Section. Thus, the harassment complained of by Faragher was based upon her being a female.

*Whether the harassment complained of affected a "term, condition, or privilege" of employment*

■ The fourth element of the prima facie case requires closer scrutiny. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Systems, Inc.,* —— U.S. ——, ——, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993). Whether an environment is hostile or abusive can be determined only by looking at all the circumstances. *Id.* The factors to be considered may include:

— the frequency of the discriminatory conduct;

— its severity;

— whether it is physically threatening or humiliating, or a mere offensive utterance;

— whether it unreasonably interferes with an employee's work performance;

— the effect on the employee's psychological well-being, which is relevant to determining whether the plaintiff actually found the environment abusive.

*Id.*

Terry had a propensity to touch female employees of the Marine Safety Section on various parts of their anatomies without their consent. Former lifeguards Ewanchew, Faragher, Barta, Herrington, and Nye and former secretaries Buhr and Chisesi were the recipients of uninvited touching by Terry. Terry touched Ewanchew's buttocks and breast, Faragher's buttocks, Barta's buttocks, Herrington's thigh, Nye's hip, and Buhr's and Chisesi's necks. All except the secretaries credibly testified that they found such touching offensive. In addition, Terry used offensive language when speaking to female employees such as Ewanchew, Herrington, and Bonner. Terry described Faragher to Ewanchew as "male-like" because Faragher had no breasts. In speaking to Herrington, Terry referred to women as "cunts" and "bitches." Terry asked Bonner if she was going to "fuck" or "screw" her male co-workers. Silverman tackled Faragher and stated to her, "If you had tits I would do you in a minute." He used the word "helmet" to refer to a man's penis when speaking to Ewanchew. He mimicked cunnilingus by flicking his tongue in the presence of Faragher and Ewanchew. He commented to Herrington that her nipples showed through her swimsuit and that he would like to "eat between her legs." He made a comment to Evans about her breasts. He stated to Nye that he wanted to "lick her clit" and used the words "fuck" and "cunt" when complaining about her blowing an air horn close to his ear. All except Evans found such remarks offensive.

Based on the number of lifeguards that testified to such conduct, the Court finds that Terry's and Silverman's offensive conduct occurred fairly frequently. The Court also finds that the uninvited touching, the use of the cited terms, and the mimicry constitute fairly severe conduct. In this regard, the Court rejects the defendants' characterization of Terry's and Silverman's language as "banter." The Court finds a significant difference between the consensual sprinkling of off-color terms into everyday conversation and the recurrent use of terms such as "cunt" and "bitch" by males in their conversations with females. Moreover, the Court finds that uninvited touching, the use of words like "cunt" and "bitch," and a pantomime of oral sex constitute conduct that humiliates women.

The Court finds that Terry's and Silverman's conduct unreasonably interfered with Faragher's work performance by promoting an environment where female lifeguards were considered fair game for uninvited touching and offensive remarks. The Court has recognized that the level of camaraderie among the lifeguards in the Marine Safety Section bordered on boisterousness due to the disproportionate ratio of female to male lifeguards and the cramped quarters where the lifeguards were often running into each other. Camaraderie, however, is not synonymous with the lack of respect evidenced by Terry's and Silverman's conduct toward their female co-workers, including Faragher.

The effect of the environment created by Terry's and Silverman's conduct upon Far-

agher is more difficult to quantify. Based on Faragher's testimony, the Court has no doubt that Faragher neither invited nor appreciated her supervisors' conduct. Faragher, however, seems to have gone about her business despite such conduct without complaining to anyone except Gordon. Indeed, Faragher does not appear to have found the Marine Safety Section atmosphere sufficiently adverse to caution her own sister against applying for a position there. Faragher's position as a part-time and summer employee, and her concomitant college studies, may help explain her apparent nonchalance regarding the environment created by Terry and Silverman. Moreover, Faragher does not appear to have been exposed as much as Ewanchew to overt physical acts by Terry. Looking at the totality of the circumstances, therefore, the Court finds Terry's and Silverman's conduct sufficiently severe or pervasive to alter the conditions of Faragher's employment and create an abusive working environment, despite Faragher's attenuated reaction to such environment.

### *Respondeat superior*

■ A plaintiff may prove the fifth element of a hostile environment claim either directly or indirectly. To prove this element, the employee "must show that the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Henson,* 682 F.2d at 905. "The employee can demonstrate that the employer knew of the harassment by showing that she complained to higher management of the harassment, or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." *Id.* The pervasiveness analysis applicable to the fourth element is the same as that required for constructive notice under the fifth element. *Vance v. Southern Bell Tel. & Tel. Co.,* 863 F.2d 1503, 1513 (11th Cir.1989).

■ The Eleventh Circuit has indicated that application of a strict liability standard to employers is illogical in a pure hostile environment setting. *Steele,* 867 F.2d at 1316. However, the Eleventh Circuit has acknowledged that, even in pure hostile environment cases, the trier of fact must determine whether the harasser was acting as an agent of the employer, in which case the employer is directly liable and the plaintiff need not show either actual or constructive notice. *Huddleston v. Roger Dean Chevrolet, Inc.,* 845 F.2d 900, 904 (11th Cir.1988) (following *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 71, 106 S.Ct. 2399, 2407, 91 L.Ed.2d 49 (1986), where the Supreme Court said agency principles apply to the determination of corporate liability under Title VII). *See also Vance,* 863 F.2d at 1514–15. In making this agency determination, the trier of fact must consider not only the supervisor's direct authority over the plaintiff but also the overall structure of the workplace, including the relative positions of the parties involved. Relevant questions regarding this relationship include the supervisor's authority to: designate work assignments and staffing of shifts, to suspend employees, to place discipline reports in employee personnel files, to handle union grievance proceedings, and to make personnel changes in his department. *Id.* at 1515.

■ The Court has found that the City had no actual knowledge of Terry's and Silverman's sexual harassment prior to Personnel Director Richard Bender's receipt of Ewanchew's letter. The Court, however, has found Terry's and Silverman's conduct sufficiently severe or pervasive to alter the conditions of Faragher's employment and create an abusive working environment. This finding of pervasiveness supports an inference of knowledge, or constructive knowledge, on the part of the City regarding Terry's and Silverman's sexual harassment, making the City indirectly liable for such conduct.

■ In addition to considering indirect liability through constructive notice, the Court must determine whether the City is directly liable for Terry's and Silverman's conduct under agency principles. The Court has found that Terry, Silverman, and Gordon were all supervisors of the City's ocean lifeguards. In making this determination, the Court has considered all of the testimony related to these individuals' duties and authority toward the lifeguards. As Marine Safety Chief, Terry had the authority to su-

pervise all aspects of the lifeguards' work assignments, to conduct counseling and oral reprimands and place reports of such disciplinary actions in the lifeguards' personnel files. Terry also interviewed and selected new lifeguards, subject to approval by higher management. As lieutenant and later, as captain, Silverman had supervisory responsibility over the lifeguards' daily duties, including designation of the lifeguards' work assignments and staffing of shifts, and supervision of their physical fitness routines. Gordon had similar responsibilities as lieutenant and, later, training captain. Moreover, the paramilitary configuration of the Marine Safety Section constitutes evidence of a clear chain of command from lieutenants to captains to the chief. Through this chain of command, the City vested in the Marine Safety supervisors both administrative and disciplinary authority over the lifeguards. Indeed, the lifeguards' contacts with higher city officials, such as the Recreation Superintendent, were almost non-existent.[1]

Taking into consideration this overall workplace structure, as well as their supervisory authority, the Court finds that Terry, Silverman, and Gordon were agents of the City. Because the two harassers in this action, Terry and Silverman, were acting as agents of the City, the City is directly liable and Faragher need not show either actual or constructive notice of the harassing conduct on the part of the City. Moreover, although not a harasser himself, Gordon knew of the lifeguards' discomfort with Terry's and Silverman's conduct but failed to report the complaints brought to him to either Terry or to the City's management. This knowledge on the part of the City's agent, and the agent's inaction, provides a further basis for imputing liability on the City.

*Remedial action*

■ Having found that Faragher proved a prima facie case for hostile environment sexual harassment, the Court next considers

the City's defense that it took prompt remedial action upon learning of Terry's and Silverman's conduct. The Court has found that, once the City received actual knowledge of Terry's and Silverman's conduct in the form of Ewanchew's letter to Bender, the City acted with dispatch to investigate and remedy the situation. The Court, however, has found that the City should have known about the conduct prior to receipt of Ewanchew's letter through constructive notice.[2] Therefore, the Court must examine the City's efforts to prevent sexual harassment prior to Bender's investigation.

In this respect, the Court has found a complete failure on the part of the City to disseminate its written sexual harassment policy among Marine Safety Section employees. Indeed, not even the supervisors were ever told or made aware of the City's policy against sexual harassment prior to Bender's investigation. Therefore, the City's written sexual harassment policy does not excuse it from liability. The Court has also found that Faragher did not avail herself of the existing union grievance proceedings to register a complaint about Terry's and Silverman's conduct. The City's failure to disseminate its policy against sexual harassment, however, makes such avenue of complaint ineffectual. *See Cronin v. United Serv. Stations, Inc.*, 809 F.Supp. 922, 929 (M.D.Ala.1992) (To avoid respondeat superior liability, an employer must provide some avenue by which an employee can make the employer aware of the illegal conduct.).

Having found no merit in the City's defense, the Court concludes that the City is liable for Faragher's Title VII claim. The Court has already determined that Faragher is not entitled to compensatory damages on her Title VII claim, as provided under the 1991 Civil Right Act, because the events giving rise to the claim took place prior to the enactment of the Act. *See Order Granting in Part and Denying in Part Defen-*

---

1. The Court uses the past tense in this description advisedly. As noted in the findings of fact, Bill Terry no longer holds the position of Marine Safety Chief. In addition, according to testimony presented at trial, the City has effected a restructuring of the beach patrol and ancillary

water recreation services under the name of "Aquatics."

2. The Court has also found that the City is liable for the conduct, regardless of notice, on agency principles.

*dants' Motions to Dismiss and/or Strike,* filed August 13, 1992, at 4–5. The Court has also determined that Faragher is not entitled to injunctive or declaratory relief because she is no longer employed by the City and she does not seek reinstatement of her position. *See id.* at 5. Therefore, the Court shall award Faragher nominal damages in the amount of one dollar.

#### 2. Faragher's (Count II) & Ewanchew's (Count III) § 1983 claims against Terry & Silverman

A § 1983 cause of action lies against a defendant who, acting under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Bendiburg v. Dempsey,* 909 F.2d 463, 468 (11th Cir.1990). Several circuits have either explicitly or impliedly recognized the existence of a § 1983 cause of action for sexual harassment, as violative of the equal protection clause of the fourteenth amendment. *See, e.g., Bohen v. City of East Chicago,* 799 F.2d 1180 (7th Cir.1986); *Starrett v. Wadley,* 876 F.2d 808 (10th Cir.1989); *Headley v. Bacon,* 828 F.2d 1272 (8th Cir.1987); *Pontarelli v. Stone,* 930 F.2d 104 (1st Cir.1991); *Carrero v. New York City Hous. Auth.,* 890 F.2d 569 (2d Cir.1989); *Poe v. Haydon,* 853 F.2d 418 (6th Cir.1988). Although the Eleventh Circuit has not yet addressed this precise issue, the Court has determined, based on the weight of authority from other circuits, that such a cause of action is cognizable.

#### A. Color of state law:

A person acts under color of state law when his or her actions are "fairly attributable to the State," that is, when the person's "official character is such as to lend the weight of the State to his [or her] decisions." *Burch v. Apalachee Community Mental Health Servs., Inc.,* 840 F.2d 797, 803 (11th Cir.1988) (citations omitted). The Court has found that both Terry and Silverman were supervisors of the lifeguards, including Faragher and Ewanchew. Such supervisory authority lent the weight of the City to their decisions and conduct toward the plaintiffs. Therefore, the Court con-

cludes that Terry and Silverman acted under color of state law.

#### B. Violation of the plaintiffs' constitutional right to equal protection:

In *Trautvetter v. Quick,* 916 F.2d 1140 (7th Cir.1990), the Seventh Circuit has provided a comprehensive analysis regarding the equal protection element of a § 1983 cause of action. According to *Trautvetter,* a plaintiff wishing to sustain an equal protection claim of sexual harassment must show both "sexual harassment and an intent to harass based upon that plaintiff's membership in a particular class of citizens—i.e. male or female." The "harassment" prong is met by showing actionable harassment under Title VII. The "intent" prong requires proof that the defendant's discriminatory conduct was intentional; that is, the conduct was because of the plaintiff's status as a male or female, rather than because of some other personal characteristic. *Id.* at 1150.

#### Faragher's § 1983 claim

Faragher has proved a Title VII claim against the City based on Terry's and Silverman's conduct. Therefore, Faragher has met the harassment prong of her § 1983 claim against the individual defendants. The Court also finds that Terry's and Silverman's discriminatory conduct was intentional because it was directed to Faragher due to her status as a female. Indeed, the credible testimony of all of the female lifeguard witnesses leads the Court to the conclusion that Terry and Silverman preyed on the female members of the Marine Safety Section. Therefore, the Court finds that Faragher has proved her § 1983 claims against both Terry and Silverman.

As a defense to Faragher's § 1983 claim, Terry argues that he is protected by qualified immunity because his conduct did not violate clearly established law. "Qualified immunity protects government officials performing discretionary functions from civil liability if their conduct violates 'no clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Post v. City of Fort Lauder-*

*dale,* 7 F.3d 1552, 1556 (11th Cir.1993) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). In addressing this issue, the Court follows the two-step analysis established by the Eleventh Circuit:

> We must determine (1) whether the official established that he or she acted within the scope of discretionary authority when the allegedly wrongful acts occurred, and (2) whether the plaintiff demonstrated that the official's actions violated clearly established rights.

*Sims v. Metropolitan Dade County,* 972 F.2d 1230, 1236 (11th Cir.1992). Terry has not shown that he acted within the scope of his discretionary authority as Marine Safety Chief when he sexually harassed Faragher. Indeed, it is difficult for the Court to conceive of a situation where a supervisor's discretionary authority includes uninvited touching of subordinates. Thus, Terry does not satisfy the first prong of the qualified immunity analysis. The Court further finds that Terry has not met the second prong of the qualified immunity inquiry. The statutory right to be free of discrimination based upon sex in the workplace is embodied in Title VII of the 1964 Civil Rights Act. Moreover, since 1986, a § 1983 cause of action for sexual harassment, as violative of the equal protection clause of the fourteenth amendment, has been recognized by the Seventh Circuit. *See e.g., Bohen v. City of East Chicago,* 799 F.2d 1180 (7th Cir.1986). None of the circuits that have addressed this issue since *Bohen* have found otherwise. Therefore, during the time of Faragher's tenure with the City, from 1985 to 1990, a reasonable person would have known that sexual harassment violates clearly established law. *See Andrews v. City of Philadelphia,* 895 F.2d 1469, 1479 (3d Cir.1990).[3] Based on the foregoing analysis, the Court finds no merit in Terry's qualified immunity defense. Hence, the Court finds that Terry and Silverman are liable for Faragher's § 1983 claims against them.

### Ewanchew's § 1983 claim

The Court next evaluates Ewanchew's proof to determine whether she has made out a Title VII claim, as required by the first prong of a § 1983 cause of action for sexual harassment. Like Faragher, Ewanchew presents a hostile environment claim. As previously noted, the elements of a prima facie case for hostile environment sexual harassment are:

> (1) the employee belongs to a protected group;

> (2) the employee was subject to unwelcome sexual harassment;

> (3) the harassment complained of was based upon sex;

> (4) the harassment complained of affected a "term, condition, or privilege" of employment; and

> (5) respondeat superior.

*Henson v. City of Dundee,* 682 F.2d 897, 903–05 (11th Cir.1982).

As in the case of Faragher, the first three elements can be addressed in short order. As a female, Ewanchew belongs to a protected group. Ewanchew was subject to unwelcome sexual harassment by Terry in the form of uninvited touching on the buttocks and on one breast, and in the form of offensive language, when referring to Faragher as being "male-like" because she had no breasts. Ewanchew was also subject to unwelcome sexual harassment by Silverman in the form of offensive comments such as, "There are a lot of tits on the beach today," and in the form of an offensive pantomime mimicking cunnilingus. Terry and Silverman directed their conduct toward the female lifeguards and secretaries in the Marine Safety Section. Thus, the harassment complained of by Ewanchew was based upon her being a female. Moreover, the respondeat superior

---

**3.** In *Woodward v. City of Worland,* 977 F.2d 1392 (10th Cir.1992), *cert. denied sub nom Woodard [sic] v. Seghetti,* — U.S. ——, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993), the Tenth Circuit disagreed with the *Andrews* court's analysis and found that the law on this matter was not clearly established in the Tenth Circuit until that circuit explicitly found a § 1983 cause of action for sexual harassment in 1989. Were the Court to follow this reasoning, it would have to find that the law will not be clearly established in the Eleventh Circuit until the Eleventh Circuit addresses this issue. The Court finds such an approach toward the advance of the law too parsimonious. The Court, therefore, adopts the reasoning in *Andrews.*

analysis conducted by the Court in connection with Faragher's Title VII claim is directly applicable to Ewanchew. Therefore, to determine whether Ewanchew has made out a Title VII claim, the Court need only address the fourth element of the prima facie case, whether the harassment complained of affected a "term, condition, or privilege" of Ewanchew's employment.

In conducting this inquiry under Faragher's Title VII claim, the Court has found that Terry's and Silverman's conduct created an abusive working environment. In reaching this determination, the Court found that Terry's and Silverman's conduct was fairly frequent and severe, that such conduct is humiliating to women and that it unreasonably interferes with a female lifeguard's work performance. As with Faragher, however, the Court has found it difficult to gauge the effect of this environment upon Ewanchew. As previously noted, the Court finds credible Ewanchew's allegations of conduct by both Terry and Silverman, but finds not credible her present assertion that she found such conduct intolerable, *then.* Indeed, Ewanchew's request for a part-time job after she left the City's employ makes it illogical to find a perception of hostility in the work environment on her part. As noted by the United States Supreme Court in *Harris v. Forklift Systems, Inc.,* — U.S. —, —, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993), "[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." Because an evaluation of Ewanchew's testimony leads the Court to conclude that she did not perceive the environment as abusive, the Court finds that Ewanchew has failed to establish the fourth element of a Title VII claim. Therefore, Ewanchew cannot satisfy the harassment prong of her § 1983 claim against Terry and Silverman. Hence, the Court finds that Terry and Silverman are not liable for Ewanchew's § 1983 claims against them.

### 3. Faragher's (Count IV) and Ewanchew's (Count V) battery claims against Terry

"To establish a battery, a plaintiff must suffer a harmful or offensive contact, and the tortfeasor must have intended to cause such contact. The intent may be established if the plaintiff demonstrates the tortfeasor acted with reckless disregard of the consequences of his act." *Chorak v. Naughton,* 409 So.2d 35, 39 (Fla. 2d DCA 1981). The proven instances of Terry's uninvited touching of Faragher and Ewanchew constitute offensive contacts. Moreover, Terry's proven propensity to touch female employees on various parts of their anatomies, including the waist, neck, and buttocks, shows that he acted in reckless disregard for the consequence of his acts. Therefore, the Court has no difficulty in concluding that Terry is liable for both Faragher's and Ewanchew's battery claims against him.

### 4. Faragher's (Count VI) and Ewanchew's (Count VII) claims for negligent retention and supervision of Terry against the City

"Negligent retention of an employee occurs when, during the course of employment, the employer becomes aware or should have become aware of problems with the employee that indicate his unfitness, but the employer fails to take further action, such as investigation, discharge, or reassignment." *Tallahassee Furniture Co., Inc. v. Harrison,* 583 So.2d 744, 753 (Fla. 1st DCA 1991), *rev. denied,* 595 So.2d 558 (Fla.1992) (citing *Garcia v. Duffy,* 492 So.2d 435, 438 (Fla. 2d DCA 1986)). This actual or constructive notice requirement applies equally to claims for negligent supervision. *M.V. v. Gulf Ridge Council Boy Scouts of America, Inc.,* 529 So.2d 1248, 1248 (Fla. 2d DCA 1988). The establishment of a wrongful act, such as battery, by an employee is required in order to impose negligence liability upon an employer for negligent supervision and retention. *See Walsingham v. Browning,* 525 So.2d 996, 998 (Fla. 1st DCA 1988).

Both Faragher and Ewanchew have proven their claims of battery against Terry. This wrongful act establishes one necessary element of negligent supervision and retention of Terry by the City. The other element

is actual or constructive notice of Terry's unfitness and failure on the part of the City to take remedial action. The Court has determined that the City did not have actual notice of Terry's conduct prior to Personnel Director Richard Bender's receipt of Ewanchew's letter. The Court has also found that the City acted with dispatch to investigate Terry's conduct and to discipline him after confirming that he had indeed engaged in inappropriate behavior. Therefore, the City is not liable for Terry's conduct under the actual notice prong of the negligent supervision and retention claims.

In examining Faragher's Title VII claim the Court found that the City should have known about Terry's and Silverman's conduct based on the pervasiveness of their conduct. The constructive notice test for negligent supervision and retention, however, does not contemplate the pervasiveness analysis of Title VII. Applying the standard of a reasonable employer to the City, the Court finds insufficient proof to establish that the City should have become aware of problems with Terry's conduct prior to Ewanchew's letter. In retrospect, it appears to the Court that the City may have given Terry too much control over Marine Safety Section. Indeed, it was obvious from the testimony of Dioli–Kumm and Gardner that these two Recreation Superintendents did not have much control over Terry. The City's restructuring of the water recreation services into a new "Aquatics" organization and the removal of Terry from supervisory duties provide further support for this assessment. Nevertheless, in light of the events that transpired prior to Ewanchew's letter, the Court does not find a sufficient predicate to impose constructive notice of Terry's conduct on the City. Therefore, the Court finds that Faragher and Ewanchew did not prove their claims of negligent supervision and retention of Terry against the City.

### 5. Damages

The Court awards nominal damages of one dollar to Faragher on her Title VII claim against the City. Faragher is also entitled to compensatory damages against Terry and Silverman on her § 1983 claim, and against

Terry on her battery claim. The Court has found that Faragher is entitled to $10,000.00 in compensatory damages. Therefore, the Court awards Faragher the sum of $10,000.00 in compensatory damages against Terry and Silverman, jointly and severally.

Ewanchew has prevailed on her battery claim against Terry and she is entitled to compensatory damages in the sum of $35,000.00. Therefore, the Court awards Ewanchew the sum of $35,000.00 in compensatory damages against Terry.

The Court has found that Terry is liable for $2,500.00 in punitive damages. Because the Court has found that Ewanchew was exposed to more overt acts on the part of Terry than Faragher, the Court awards Faragher $500.00 and Ewanchew $2,000.00 in punitive damages against Terry.

### CONCLUSION

Pursuant to *Fed.R.Civ.P.* 58, the Court shall enter its final judgment by separate order in accordance with the foregoing findings of fact and conclusions of law.

DONE AND ORDERED.